## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **U.S. ANESTHESIA PARTNERS, INC.** as Administrator of **U.S. ANESTHESIA PARTNERS, INC. WELFARE BENEFITS PLAN** as successor in interest to **U.S. ANESTHESIA PARTNERS OF COLORADO WELFARE BENEFITS PLAN**, individually and as representatives of a class of welfare benefits plans and plan administrators, | § § § § § § § | |
| Plaintiffs, | § § | Civil Action No. _____ |
| v. | § § | |
| **UNITEDHEALTH GROUP, INC.** and **UNITED HEALTHCARE SERVICES, INC.** | § § § | |
| Defendants. | § | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiffs U.S. Anesthesia Partners, Inc. ("USAP") as Administrator of the U.S. Anesthesia Partners, Inc. Welfare Benefits Plan, the successor in interest to the U.S. Anesthesia Partners of Colorado Welfare Benefits Plan (the "Plan") (collectively "Plaintiffs"), on behalf of themselves and all class members, file this Complaint as follows:

### I.

### SUMMARY OF COMPLAINT

**UnitedHealth Group's so-called mission is "to help make the health system work better for everyone." The problem is that United has, for years, exploited its size and power to develop a scheme intended make the health system work better for itself at the expense of everyone else.**

**United's idea of "help" is to create a series of problems that only it can "solve." United employs a strategy that increases the number of claims processed on**

**an out of network basis. Out of network claims usually cost benefit plans more money. United's "solution" to the problem is to reduce out of network reimbursements and then pocketing a percentage of the "savings" as a reward. United can certainly attribute a portion of its $9 billion in profits this year to "solving" a problem of its own creation.**

1.       Defendant UnitedHealth Group, Inc. ("UHC Group") is a Fortune 10 company that makes hundreds of billions of dollars on a variety of services in the healthcare industry, including offering health insurance, administering ERISA plans through service agreements, and creating provider networks, whereby providers agree to accept set rates for services rendered to United Healthcare- affiliated individuals.

2.       UHC Group and its subsidiaries have engaged in a campaign of unilaterally terminating or refusing to renew provider network agreements to force providers into the murky world of out of network reimbursement, which is unpredictable, inconsistent, and expensive for providers. UHC Group's theory is, by forcing providers out of network, it can mandate providers accept unreasonably low reimbursement rates.

3.       UHC Group and its subsidiaries also engage in the confusing "hide the ball" system of excluding certain providers who are part of larger, in network health systems. Ordinary consumers look to the system as in network, and only after the fact do they learn that a particular provider or office is not in fact in network.

4.       Perhaps worst of all, UHC Group and its subsidiaries tell benefits plans and their beneficiaries that they will reimburse emergency ambulance services at an "in network" rate but still treat the claim as out of network in calculating fees.

5.       Not content to make money off of the strong-arming of providers, UHC Group, through its subsidiary United Healthcare Services ("UHC") created a "Shared Savings" program.

This program is really a way for UHC to generate more income by moving revenue in a "left pocket to right pocket" scheme. Under the Shared Savings plan, when UHC is able to pay certain providers less than billed charges for out of network claims, it takes a 35% fee on the difference between billed charges and what was ultimately paid (the "Shared Savings fee"). This slight-of-hand trickery has earned UHC billions of dollars.

6.      Plaintiff delegated a number of fiduciary duties to UHC by virtue of its service agreement. As fiduciary, UHC owes the Plan a duty of loyalty, including the obligation to act in the Plan's best interest. When UHC affiliates (a) cancel, refuse to renew, or deliberately exclude providers, or (b) engage in misleading contract and reimbursement arrangements that give the Plan and its beneficiaries the belief their care is being handled in network when it is not, UHC costs the Plan more money in Shared Savings fees. Defendants should be stopped from harming benefits plans, including stopping the Shared Savings plan and disgorging the Shared Savings fees that were only generated as a result of UHC Group's self-interested conduct.

## II.

## PARTIES

7.      Plaintiff U.S. Anesthesia Partners, Inc. ("USAP") is a corporation organized under the laws of the State of Delaware with its principal place of business in Dallas, Texas. USAP is the administrator of the U.S. Anesthesia Partners, Inc. Welfare Benefits Plan, which is the successor in interest to U.S. Anesthesia Partners of Colorado Welfare Benefits Plan, which have been formed pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") (collectively the "Plan").

8.      Defendant United Healthcare Services, Inc. ("UHC") is a corporation organized under the laws of the State of Delaware with its principal place of business in Minnesota. UHC Services does business in the State of Colorado, including pursuant to its Administrative Services Agreement ("ASA") with the Plan.

9.      The U.S. Anesthesia Partners of Colorado Welfare Benefits Plan was consolidated with the U.S. Anesthesia Partners, Inc. Welfare Benefits Plan in 2017. This consolidated plan continued to use UHC to perform the services enumerated in the ASA for Plan employees living in Colorado, and UHC continued to charge (and be paid by) the Plan.

10.     Defendant United Healthcare Group, Inc. ("UHC Group") is a corporation organized under the laws of the State of Delaware with its principal place of business in Minnesota. UHC Group is the parent corporation of UHC.

### III.

### JURISDICTION AND VENUE

11.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action for which federal district courts have exclusive jurisdiction as set forth in 28 U.S.C. § 1332.

12.     This district is the proper venue for this action under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this claim occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

13.     All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

# IV.

## FACTUAL BACKGROUND

**A.      USAP's Role as a Business and Plan Sponsor**

14.      USAP is a single-specialty anesthesia practice that is clinically governed by practicing physicians in several states, including Colorado. Like many other businesses, USAP offers a variety of benefits to its employees, including health benefits. USAP's benefits are offered through the US Anesthesia Partners Health and Welfare Plan (the "Plan").[1]

15.      The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA was created to address concerns of pension plan fund mismanagement and abuse and extends to a variety of benefit offerings, including disability insurance and health coverage.

16.      According to the website of the U.S. Department of Labor:

> The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans. Among other things, ERISA requires that sponsors of private employee benefit plans provide participants and beneficiaries with adequate information regarding their plans. Also, those individuals who manage plans (and other fiduciaries) must meet certain standards of conduct, derived from the common law of trusts and made applicable (with certain modifications) to all fiduciaries. The law also contains detailed provisions for reporting to the government and disclosure to participants. Furthermore, there are civil enforcement provisions aimed at assuring that plan funds are protected and that participants who qualify receive their benefits. https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/history-of-ebsa-and-erisa.

---

[1] Colorado had its own benefit plan, U.S. Anesthesia Partners of Colorado Welfare Benefits Plan, which was rolled into the Plan in 2017. UHC and USAP continued to abide by the Administrative Services Agreement ("ASA") as to Colorado Plan beneficiaries.

17.     USAP serves as the Plan Sponsor and Plan Administrator. As Plan Administrator, USAP is responsible for general oversight of the Plan. Pursuant to the terms of the Plan, USAP, as Administrator, is the Plan's fiduciary.

**B.      UHC Functions Not as an "Insurance Company" But As a Claims Administrator and Fiduciary.**

18.     When one thinks of "insurance," typically, an insurance company calculates risk in certain sectors (such as property) and accepts premium from insureds in exchange for an agreement to cover losses experienced by the insured, subject to the terms and conditions, coverages, and exclusions.

19.     "Health insurance" for ERISA plans works differently. ERISA plans, including USAP's Plan, are self-funded, meaning that premium contributions by USAP and plan participants fund a pool of money from which claims are paid. The Plan, like other ERISA plans, relies on "stop loss" or "excess loss" insurance to cover claims that exceed USAP's and participants' contributions.

20.     As a self-insured plan, it was important to USAP that the Plan partner with a claims administrator that would have a broad array of contracted providers to ensure that the Plan and its participants would have stable, predictable coverage.

21.     With that in mind, on or about January 1, 2016, USAP as Administrator entered an Administrative Services Agreement ("ASA") with UHC. Pursuant to the terms of the Agreement, the Plan can delegate certain roles – including fiduciary roles – to third parties. The Plan delegated many fiduciary duties to UHC, including the ability to administer claims for the Plan.

**C.     The ASA Gave UHC Sole Responsibility for Handling Health Benefits Claims of Plan Participants.**

22.     UHC tries to downplay its role in conducting key administrative duties under the Plan, claiming that it only performs "certain agreed upon claims administration duties." In reality, UHC handles <u>all</u> aspects of managing health benefits for the Plan. In exchange for a fee, UHC:

    a.  Prepares a customized draft of a Summary Plan Description ("SPD"), which details what the plan does and does not cover;

    b.  Provides summary of benefits and coverage;

    c.  Establishes and administers claims procedures: **UHC requires that it be appointed as a "named fiduciary" under the Plan to perform**:

        i.  Benefits determinations;

        ii.  Plan construction and interpretation;

        iii.  Determination of validity of charges; and

        iv.  Administration of appeals

    d.  Offers Plan participants the ability to access UHC Provider Networks, which permit participants to see network providers at rates separately negotiated between UHC and the providers;

    e.  Provides Value Based Contracting;

    f.  Provides auditing services and recovers overpayments;

    g.  Provides access to Pharmacy Networks and mail order pharmacy services, including the creation of a prescription drug list to be used by the Plan;

    h.  Maintains benefit plan;

    i.  Provides participant enrollment, including issuing ID cards;

    j.  Provides "overall program accounting," including cost projections and reserve estimates;

    k.  Provides interface with stop loss vendor; and

      l.   Administers UHC's "Shared Savings Program."

23.    This is not an exhaustive list of services provided by UHC under the ASA. Simply put, UHC provides a "turn-key" solution for planning, creating, and administering health benefits for the Plan. UHC is rewarded handsomely for its services. Since 2017, the Plan paid UHC approximately **$3,000,000.00** in administrative fees.

**D.**    **UHC Has An Aggressive "Terminate to Negotiate" Strategy.**

24.    One of the services offered under the ASA is access to UHC's Provider Network. The Provider Network is comprised of health care providers that have entered contracts with UHC, where the providers agree to be paid pre-determined rates for their services.

25.    It is widely known that UHC has been engaged in a "terminate to negotiate" strategy as a way to force providers to take lower reimbursement rates. News stories abound of UHC's decision to obstruct network relationships with large provider groups such as Houston Methodist, TeamHealth, Envision, Mednax, Renown, Montefiore, Providence Anesthesiology Associates, and even USAP. UHC claims that "high charges" are the reason why it terminated these relationships. This disingenuous explanation fails to adequately explain that so-called "high charges" are not close to what a provider actually is paid.

26.    Providers use "billed charges" (the initial charge on a bill) as a means to negotiate provider network agreements. When a provider is in network, the provider is only paid network rates. The "billed charges" are immaterial.

27.    Billed charges only become relevant when a provider is out of network, which, in many cases, is a circumstance of UHC's creation. When UHC kicks providers out of network,

those providers are subject to being reimbursed pursuant to UHC's non-transparent out of network formulas.

**E.     UHC Has No Transparent Methodology For How it Reimburses Out of Network Providers, Which Also Adversely Affects Plans.**

28.     When UHC removes a provider from its network, the provider loses all predictability of how it will be paid, and the Plan loses all predictability of what its costs will be.

29.     UHC claims that it follows the member's benefit plan in determining which reimbursement methodology applies. USAP can find no such methodology in the Plan. At best, in USAP Summary Plan Documents (SPD), UHC says its payment of non-network claims is based on, "Negotiated rates agreed to by the non-Network provider and either UnitedHealthcare or one of UnitedHealthcare's vendors, affiliates or subcontractors, at UnitedHealthcare's discretion." A provider does not know which of these methodologies UHC plans to use. A Plan and its beneficiaries have no idea of what the rates of the "vendor, affiliates or subcontractors" are, much less which one UHC plans to use on a given claim.  No one but UHC knows how these rates are "negotiated," what the "negotiated rates" are, or with whom they are negotiated. This "methodology" is a grab-bag used by UHC to maximize money in its pocket.

30.     UHC Group has a long history with manipulating reimbursement rates and methodologies for its own gain. In 2009, UHC Group paid hundreds of millions of dollars to settle claims brought by the New York Attorney General and class action suits alleging that a UHC Group subsidiary called Ingenix manipulated the database used by UHC and other insurers to set payment rates for out-of-network services by "intentionally skew[ing]" "usual and customary"

rates downward. As a result of that settlement, UHC Group was required to fund $50 million to develop what became the FAIR Health database.

31.     More recently, UHC Group was fined over $15 million by the U.S. Department of Labor for its unfair treatment of patients seeking mental health treatment. Among other things, UHC Group was accused of overcharging patients for out-of-network mental health services by reducing reimbursements.

32.     Because no transparency to UHC's reimbursement "methodology" exists, providers and beneficiaries are frequently required to appeal and challenge initial reimbursement rate determinations, which costs time, money, and effort. It takes beneficiaries (and therefore plans) some time to find out who is responsible for paying what.

33.     One may think that UHC's efforts to force low provider reimbursement rates would ultimately benefit plans and their beneficiaries, who are patients of these providers. However, if contract rates are unreasonably low, providers often have no choice but to remain out of network to keep practices and facilities open. A lack of network providers ultimately results in higher costs to the Plan and its members, as plans generally pay more for out of network claims – although not necessarily in the form of higher reimbursement to providers – and Members usually have much higher out of network deductibles, or they may not have any out of network coverage at all.

F.     **UHC Extends its Money Grab Through the "Shared Savings Program."**

34.     While using the "terminate to negotiate" strategy, UHC has the added benefit of being able to earn more money through its "Shared Savings Program" ("Shared Savings"). Shared Savings is a "service" provided to customers such as the Plan. According to UHC, Shared Savings "provides additional savings on select non-Network facility and physician claims not eligible for

standard network discounts. [Shared Savings] provides access to discounted charges made available to United from health care providers who contract or will negotiate with a third party to provide such discounted charges."

35.     In other words, UHC contends that Shared Savings helps plans save money on claims submitted by out of network providers. In reality, Shared Savings is a way for UHC to pay itself for a problem it created. UHC charges plans a fee of 35% of the "savings" realized between the billed charges of the out of network provider and the fee ultimately paid to the provider.

36.     Shared Savings is really used to enrich UHC to the detriment of the Plan. For example, a provider may have had a network agreement to be paid $5,000.00 for a particular claim. If UHC terminates the agreement, and the provider bills $10,000 for the services on an out of network basis, *even if* UHC pays more than the contracted rate for the claim – say $6,000 (which would be good for a provider) – UHC recovers an additional $1,400 in "shared savings" (or 35% of the $4,000 difference).

37.     If UHC were to pay below the network rate - say $4,000 (which theoretically would be better for the Plan) – the plan would also pay UHC $2,100 for shared savings. In both cases, the Plan pays more than the $5,000 it otherwise would have had to pay on a network claim.

38.     In the Shared Savings Program, UHC always wins to the ultimate detriment of the Plan and its beneficiaries. The Plan has paid over $600,000.00 in Shared Savings fees. The Plan wanted to exclude the Shared Savings "service," but UHC refused.

39.     This Shared Savings scheme violates UHC's fiduciary duty to the Plan. UHC should be required to disgorge the amount it was improperly enriched by virtue of this improper Shared Savings Program. UHC should also be enjoined from further use of this Shared Savings

Program or any similar program that financially rewards UHC for deliberately excluding providers from its Provider Network.

## V.

## FACTUAL ALLEGATIONS AS TO PLAN

40.     UHC has used the Shared Savings Program in numerous ways for its financial benefit. This lawsuit is restricted to three circumstances: (1) UHC charging Shared Savings fees for ambulance claims it contends are being processed in network; (2) UHC charging Shared Savings fees for providers UHC either will not allow in network or excludes from the Provider Network through cancellation and non-renewal of provider agreements; (3) UHC charging Shared Savings fees for claims that are treated as out of network even when they are provided through an in-network health system.

### A.     UHC Does Not Let Municipal Ambulances in Network but Claims it Pays Network Rates. Yet, UHC Still Charges Shared Savings.

41.     Ambulance services are a frequent source of out-of-network "surprise" charges. A person has an emergency, calls 911, and the ambulance takes him to the hospital. When the person gets home, he receives a bill showing that the ambulance is out of network, and he is saddled with a large out-of-pocket cost. This is the classic case of "surprise billing" that has been discussed in the news and is the subject of new federal legislation. However, ground ambulance services are not covered by this new law.

42.     UHC claims that it will help patients who do not have a choice but to call an ambulance. UHC's website says,

*Out-of-Network Ambulance (Emergency)*

If the ambulance transportation is covered, the benefit level for out-of-Network Emergency ambulance (ground, water, or air) is covered at the Network level of deductible and coinsurance.

43.     In reality, UHC does not follow its own reimbursement policy. In 2020 alone, the Plan had claims for providers including Parker South Metro Fire Rescue Authority, Crested Butte Fire Protection District, and Lee County BOCC-EMS. These are public ambulance services that responded to emergencies. By UHC's own policy, these claims should have been covered at network levels. If the claim is covered as in network, then there is no "savings," and no Shared Savings fee should be assessed.[2] Yet, UHC assessed the Plan over $5,500.00 in "Shared Savings" fees for 2020 alone.

**B.      UHC Refuses to Put Providers in Network and Still Charges Shared Savings.**

      1.      **UHC Charged Shared Savings on a Provider it Excluded for Almost Two Years.**

44.     A USAP plan beneficiary, Patient 1, sought treatment from Provider X on two occasions in November 2020. On both occasions, UHC contended it saved USAP money because it only paid roughly 50% of Provider X's billed charges. As a result, UHC took a Shared Savings payment on each of these claims, which totaled about $128.00.

45.     UHC should not have been paid *anything* in Shared Savings because it refused to enter a network arrangement with Provider X. Provider X tried for almost two years to be in network with UHC. Provider X finally secured a network arrangement that has started or will start after Patient 1's care. But for UHC's stonewalling, Patient 1's care would have been from a

---

[2] By UHC's own definition, Shared Savings fees only apply to claims not eligible for standard network discounts. UHC's own policy states that emergency ambulance claims are to be treated as network claims.

network provider (which, by UHC's own admission, would result in lower cost to the patient), and USAP would not have been charged a Shared Savings fee.

   2.   **USAP Was a Victim of UHC's Out of Network Strategy Both as a Plan and as a Provider.**

46.    USAP has been harmed by UHC through its benefits plan *and* as a provider. USAP[3] and UHC are currently in arbitration surrounding the demise of the USAP-UHC network relationship in Texas and Colorado. In Colorado, United terminated the network agreement with USAP, without cause, with a full year remaining on the term of the agreement. USAP was out of network in September 2020, when one of the Plan's beneficiaries received care from a USAP Colorado physician. USAP billed UHC $1,998.00 for its services. UHC only paid USAP $363.92 on the claim. UHC charged the USAP Plan $571.93 in Shared Savings fees. **Yes, UHC <u>charged</u> the USAP Plan <u>*even more*</u> than they <u>paid</u> the USAP health care provider**. These are exactly the kind of charges that show Shared Savings is nothing more than a vehicle to enrich UHC.

**C.   UHC Charged USAP Shared Savings for Out-of-Network Providers Who Are Part of In-Network Health Groups.**

47.    USAP plan beneficiaries sought care from providers such as St. Anthony Breckenridge, Denver Health & Hospital, and the University Medical Center of South Nevada. These systems all hold themselves out as network providers. Yet, certain claims submitted by these health systems are out of network. This *ad hoc* contracting is hidden from the public and results in harm to patients and the Plan, who is charged Shared Savings fees for these claims. In 2020, the

---

[3] For purposes of discussing its role as a provider, USAP would include not only U.S. Anesthesia Partners, Inc. but also its affiliated and managed practices.

Plan was charged over $2,800.00 in Shared Savings fees attributable to claims from large health systems who otherwise appear to be in network with UHC.

48.     If UHC were operating in the best interest of the Plan, UHC would not play these games. UHC would fairly contract with providers and have a transparent, predictable system of reimbursement.

## VI.

## CLASS ACTION ALLEGATIONS

49.     29 U.S.C. § 1392 (a) authorizes any Plan fiduciary to bring an action to recover the remedies provided by 29 U.S.C. § 1109(a). USAP is the named administrator of the U.S. Anesthesia Partners, Inc. Welfare Benefits Plan. Pursuant to the Plan, the Administrator is a fiduciary.

50.     Plaintiff brings these claims on behalf of the Plan and a class of similarly situated plans (the "ERISA Plan Class"), defined as three separate subclasses:

> All ERISA self-funded plans and plan administrators who entered agreements with UHC Group or its subsidiaries, including UHC, where the agreements provided for a "Shared Savings" program and, from January 1, 2017, the plans paid "Shared Savings" fees:

> 1.     for claims submitted by municipal Fire/EMS services where UHC paid the claim at an in-network rate; (the "Ambulance Class");

> 2.     for claims where UHC would not permit the provider to enter the UHC network; terminated the network agreement; or refused to renew the provider's network agreement (the "Refused Network Class"); and

> 3.     for claims where the out of network provider is part of a larger health system that is in network (the "Health System Class").

51.     The members of the class defined above are so numerous that joinder of all members is impracticable. While the precise number of members in the Class is known only to

---

CLASS ACTION COMPLAINT                                                                   PAGE 15

Defendants, Defendants are the fiduciaries and administrators of numerous employee welfare benefit plans governed by ERISA. As set forth above, Defendants have engaged in a practice of terminating or refusing to enter network arrangements; assessing fees for claims that should have been processed in network; and contracting with only parts of health care system rather than the whole. Defendants assessed ERISA benefits plans Shared Savings fees where the fees were only created as a result of Defendants' conduct.

52.     There exist issues of fact and law common to all members of the Classes including:

- what fiduciary duties were conferred to UHC;
- whether UHC breached its fiduciary duty by saying it would pay emergency ambulance services at a network rate yet still charging benefits plans "Shared Savings" fees;
- whether UHC breached its fiduciary duty by cancelling or failing to renew provider agreements and then assessing and collecting "Shared Savings" fees in connection with claims for providers that UHC forced out of network;
- whether UHC breached its fiduciary duty by refusing to admit providers to its network and then assessing and collecting "Shared Savings" fees in connection with claims submitted by those same providers;
- whether UHC breached its fiduciary duty by processing certain provider claims as out of network and therefore charging "Shared Savings" fees when the provider was part of a larger, in network health system;
- whether the Court should declare that, in the foregoing circumstances, the "Shared Savings" program and assessed fees are improper;
- whether UHC was unjustly enriched by assessing and collecting "Shared Savings" fees;
- whether UHC should be required to disgorge "Shared Savings" fees; and
- whether UHC should be enjoined from further collection of "Shared Savings" fees.

53.     Plaintiff's claims are typical of the claims of the other members of the Classes it would represent, and it will fairly and adequately represent the interests of the Classes.

54.     Plaintiff is represented by counsel who are competent and experienced in the prosecution of class action litigation.

55.     The prosecution of separate actions by class members against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.

56.     By, *inter alia*, charging Shared Savings fees where (i) care was rendered by a municipal fire/EMS service and was paid in network; (ii) UHC would not allow a provider in network or would cancel or not renew its network agreement; or (iii) the claim is treated as out of network even though the provider is part of a larger, in network system, Defendants have acted on grounds generally applicable to the Classes, rendering declaratory relief appropriate respecting the Classes.

57.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated entities to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. This action presents no difficulties in management that would preclude maintenance as a class action.

## VII.

## CAUSES OF ACTION

### COUNT ONE: ERISA VIOLATION 29 U.S.C. § 1132(a)(2)

59.     Plaintiff re-alleges all facts pled above and below as if fully set forth herein.

60.    As a result of Defendants' fiduciary status, ERISA imposes strict fiduciary responsibilities, which includes the duty to administer ERISA plans for the benefit of the participants and beneficiaries of those plans and with the diligence a prudent man would exercise under the circumstances. Defendants are obligated to, *inter alia*, evaluate and administer claims to a fiduciary duty of loyalty and avoid all self-interest.

61.    ERISA prohibits a fiduciary from "caus[ing] the plan to engage in a transaction if he knows or should have known that such a transaction constitutes a direct or indirect…transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. §1106(a)(1)(D), and from "dealing with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). A fiduciary may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Defendants, by virtue of the fiduciary duties assumed by them, are subject to all of these prohibitions.

62.    As to the Ambulance Class, Defendants breached their fiduciary duties by saying that they would pay emergency ambulance claims in network but then treating the claims as out of network and "not eligible for standard network discounts" to assess Shared Savings fees.

63.    As to the Refused Network Class, Defendants breached their fiduciary duties by blocking provider relationships, including cancelling or terminating provider agreements or not allowing providers in network at all and then assessing and collecting "Shared Savings" fees from the plans who paid claims submitted by the same providers who were blocked out by UHC.

64.    As to the Health Systems Class, Defendants breached their fiduciary duties by engaging in *ad hoc* contracting and only permitting certain parts of large health systems in network

and then assessing and collecting "Shared Savings" fees from the plans who paid claims submitted by providers who appeared to be in network but were actually out of network. Defendants engaged in deceptive conduct and dealt with plan assets for their own benefit.

65.     Pursuant to 29 U.S.C. § 1109 and 29 U.S.C. § 1132(a)(2), Plaintiff, on behalf of itself and other class members, seek to correct Defendants' violation of ERISA as set forth herein. Plaintiff, on behalf of itself and other class members, seek to recover Shared Savings fees wrongfully paid to Defendants and to subject Defendants to such other equitable relief as the court deems appropriate, including enjoining further assessment or collection of Shared Savings fees.

## COUNT TWO: DECLARATORY AND OTHER EQUITABLE RELIEF PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

66.     Plaintiff re-alleges all facts pled above and below as if fully set forth herein.

67.     Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff and the proposed class are entitled to enforce their rights under their respective ERISA plans and seek clarification of their rights, including an order declaring:

As to the Ambulance Class:

(a) UHC's Shared Savings plan only applies to claims not eligible for standard network discounts;

(b) By processing emergency ambulance claims at in network rates, these claims are eligible for standard network discounts;

(c) Plaintiff and the class have been improperly charged Shared Savings fees as to these ambulance claims, as they did not abide by UHC's own rules for Shared Savings;

(d) Plaintiff and the class members are not obligated to pay additional improper Shared Savings fees.

As to the <u>Refused Network Class</u>:

(a) the Shared Savings plan is void as to claims submitted by providers who UHC would not permit to be in network, whether by simply barring entry, cancelling a provider network agreement, or refusing to renew a provider network agreement;

(b) Plaintiff and the class have been improperly charged Shared Savings fees as to claims submitted by providers who were only not in network due to UHC's conduct; and

(c) Plaintiff and the class members are not obligated to pay additional improper Shared Savings fees.

As to the <u>Health System Class</u>:

(a) the Shared Savings plan is void as to claims submitted by providers are part of a larger, in-network health system;

(b) Plaintiff and the class have been improperly charged Shared Savings fees as to claims submitted by providers who UHC contends are out-of-network even though they are part of a larger, in-network health system; and

(c) Plaintiff and the class members are not obligated to pay additional improper Shared Savings fees.

68.    Plaintiff also requests an accounting of Defendants' Shared Savings fee charges and reimbursement of them in accordance with Plaintiff's and the class members' rights under their ERISA plans.

**COUNT THREE: RELIEF PURSUANT TO 29 U.S.C. § 1132(a)(3)**

69.     Plaintiff re-alleges all facts pled above and below as if fully set forth herein.

70.     As set forth above, Defendants' conduct violates ERISA, specifically 29 U.S.C. §§1104(a), 1105(a), 1106(a) and (b).

71.     Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiff and the proposed class seek to enjoin Defendants' violations of ERISA and to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or terms of the plans, including (a) an accounting; (b) correction of the harm to the plans and their members as a result of the transactions; (c) disgorgement; (e) an equitable lien; (f) a constructive trust; (g) restitution; (h) full disclosure of the foregoing acts and practices; (i) an injunction against further violations; and (j) an other relief the Court deems proper.

## VIII.

## REQUEST FOR RELIEF

Wherefore, Plaintiff, on behalf of itself and other class members request this Court:

- Certify this case as a class action;

- Designate U.S. Anesthesia Partners, Inc. as Administrator of the U.S. Anesthesia Partners Welfare Benefits Plan (as successor in interest to the U.S. Anesthesia Partners of Colorado Welfare Benefits Plan) as Class Plaintiff;

- Enter judgment in favor of Plaintiff and the class;

- Find Defendants breached their fiduciary duties to Plaintiff and other class members;

- Find the Shared Savings program void as set forth herein;

- Order restitution, disgorgement, and other remedies to compensate Plaintiff and class members for the harm caused;

- Order declaratory, injunctive, and equitable relief against Defendants as discussed herein;

- Impose an equitable lien and/or constructive trust over the assets to be repaid to Plaintiff and class members;

- Award Plaintiff and the class members their costs of suit, including reasonable attorneys' fees as provided by 18 U.S.C. § 1964 and 29 U.S.C. § 1132(g); and

- Award such other and further relief to which Plaintiff and the class members may be entitled.

Dated:  September 2, 2021                     Respectfully submitted,

                                             **ARMSTRONG TEASDALE LLP**


                                             By:  */s/Vance O. Knapp*
                                             Vance O. Knapp, Atty. Reg. #24641
                                             Amy M. Pauli, Atty. Reg. #51763
                                             Armstrong Teasdale LLP
                                             4643 South Ulster Street, Suite 800
                                             Denver, Colorado 80237
                                             Tel.: 720-200-0676
                                             Fax: 720-200-0679
                                             vknapp@atllp.com
                                             apauli@atllp.com

                                             **ATTORNEYS FOR PLAINTIFF U.S. ANESTHESIA PARTNERS OF COLORADO, INC.**